UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEREK K. GREENWALD,                          :
    PLAINTIFF,                               :
                             : CIVIL ACTION NO. 3:09cv211(VLB)
                             :
    v.                                       : OCTOBER 17, 2011
                             :
TOWN OF ROCKY HILL ET AL.,                   :
    DEFENDANTS.                              :

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' [DKT. #47] MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by the Defendants Town of Rocky Hill ("Rocky Hill"), Michael D. Custer, Chief of Police ("Custer"), Lieutenant Cantania, Sergeant Leonard A. Kulas, Detective O'Brien ("O'Brien"), Detective Roy Bombaci, Officer Joseph Phelps, Officer Jon P. Lammers, Officer Vanessa J. Bilotto, Officer Frank J. Nevico. The Plaintiff, Derek K. Greenwald, ("Greenwald") brought this suit pursuant to 42 U.S.C. § 1983 alleging violations of his right to be free from unreasonable search and seizure under the Fourth Amendment as well as for false arrest. In particular, Greenwald alleges the Defendant Officers used excessive force in arresting him. Greenwald also alleges that Rocky Hill and Custer failed to supervise and train the Defendant Officers. Greenwald makes the same substantive allegations against Defendants under Article One, §§7, 8, 9 of the Connecticut Constitution. In addition, Greenwald asserts state law causes of action for reckless and negligent conduct as well as negligent infliction of emotional distress against the Defendant Police Officers. Lastly, Greenwald asserts that Rocky Hill is liable for the injuries and losses caused by the negligent acts or omissions of the Defendant Police Officers and

1

Custer under Conn. Gen. Stat. § 52-557n and for indemnification for the acts of the Defendant Officers and Custer under Conn. Gen. Stat. §7-465.  Defendants assert that they are entitled to both qualified immunity as well as governmental immunity under state law.  Defendants also argue that Greenwald's claim for indemnification fails for lack of proper notice and that Greenwald's excessive force claim is barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994).  Lastly, Defendants argue that there is no private cause of action for money damages under the Connecticut Constitution under the circumstances of this case.  For the reasons stated hereafter, Defendant's motion for summary judgment is granted in favor of all Defendants as to Greenwald's federal law claims and the Court declines to exercise its supplemental jurisdiction over Greenwald's state law claims.

### Facts and Procedural Background

The following facts relevant to Defendants' motion for summary judgment are undisputed unless otherwise noted.  On November 9, 2007 at 5:41pm, Kimberly Riedel, Greenwald's girlfriend, reported to the Rocky Hill Police that Greenwald had told her over the telephone that he was going to commit suicide with a gun.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶1-6 and Dkt. #49, Defs. Ex. A, Police Incident Report].  Officers Phelps, Lammers and Bilotto responded to Greenwald's residence at 304 Farmstead Road and upon arrival found Greenwald in his backyard holding a loaded rifle.  [*Id.*].  Greenwald had started a fire in his backyard fire pit before the police arrived.  [Dkt. #49, Def. Ex. G, Greenwald Statement].  The gun Greenwald was carrying was identified as

2

a loaded 16-gauge bolt action shotgun.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶30].

Defendants allege that when the Officers attempted to talk with Greenwald he pointed the rifle at Officers Phelps and Lammers, ran farther into the backyard, then in a northeast direction towards the Double A Transportation property which contained two large parking lots which abutted Greenwald's property and Farmstead Road.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶8].  Defendants also allege that Greenwald was told to drop the gun but did not. [*Id.*].  Greenwald disputes Defendants' account and alleges that no officer declared their purpose for entering his property at night and approaching him. [Dkt. #55, Pl. Local Rule 56(a)2 Statement and Dkt. #55, Pl. Ex. B, Greenwald Affidavit at ¶¶8-13].  Greenwald also alleges that the officers unreasonably failed to communicate that they were police officers responding to a call to check on his welfare.  [*Id.*].  In addition, Greenwald alleges that the Officers shone bright lights in his face which prevented him from seeing any uniform or other indicia of authority worn by the officers.   Greenwald further alleges that the officers shouted at the same time and in a chaotic manner making it impossible for him to understand what any one officer was saying.  [*Id.*].  Further, Greenwald asserts that he did not raise his weapon toward any officer and had no intention to fire his weapon at anyone.  [*Id.*].

Greenwald then ran into a wooded area between the houses north of 302 Farmstead Road and the Double A Transportation property.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶8-14].  Officers Kulas, Bombaci,

3

Nevico and O'Brien then arrived on the scene.  When Officer Kulas arrived on Farmstead Road, Phelps called a 10-0 which was code for officer in trouble over the radio.  [*Id.*].  Phelps reported to Kulas over the radio that he, Officer Lammers, and Officer Bilotto were fine, however they could not see Greenwald and believed that he may be trying to backtrack and come up from behind them.  Phelps said they would need to back out of the far end of the backyard to prevent the male with the rifle from coming up from behind them.  [Dkt. #49, Defs. Ex. A, Kulas Statement and Dkt. # 49, Defs. Ex. D, Phelps Statement].

Officer Kulas directed Officers Bombaci and Nevico take a position at France Street and Farmstead Road in order to have a view of France Street and 304 Farmstead Road in the event that Greenwald returned to the street or the house.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶8-14]. Officers Kulas and O'Brien then took a position on the Double A Transportation property and checked the northwest parking lot since that was the direction that Officer Phelps had said Greenwald had gone.  [*Id.*].  Officer O'Brien saw Greenwald running south along the west side of the Double A Transportation property back towards Farmstead Road.  [*Id.* at ¶18].  Officers Phelps and Bilotto then observed Greenwald running south down Farmstead Road towards them with the rifle in both his hands.  [Dkt. #49, Defs.'s Ex. D, Phelps Statement]. Phelps stated that he told Greenwald to drop the gun and then afterward Greenwald turned around and began to run north up Farmstead Road.  [*Id.*]. O'Brien and Kulas then proceeded towards Farmstead Road from the Double A Transportation property in the direction of where Greenwald had run.  [Dkt. #49,

Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶18-21].   Defendants allege that when O'Brien and Kulas reached the top ridge of a small hill between the Double A Transportation property and the north end of the Farmstead Road cul de sac, they observed Greenwald approximately 30 to 40 feet away approaching north up the hill towards them with a rifle in his hands, holding it straight out in front of him.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶21-25 and Dkt. #49, Defs. Ex. J, O'Brien Statement].

Defendants further allege that as Greenwald continued to approach O'Brien and Kulas as he ran uphill, he began to raise the muzzle end of the gun higher towards O'Brien and Kulas.  Defendants allege that O'Brien and Kulas pointed their duty weapons at Greenwald and ordered him to put down the rifle.  When Greenwald continued to raise the muzzle of the rifle, O'Brien fired two shots at Greenwald.  [*Id.*].  Greenwald then dropped to the ground instantly.  After securing the rifle and handcuffing Greenwald, who had a strong odor of alcohol on his breath and his speech slurred, he was found not to have any gunshot wounds.  [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶26].  Two holes in the front area of Greenwald's shirt were observed.  It appeared as if one of O'Brien's shots entered through the right front of Greenwald's jacket, entered the right front of his shirt, exited the left front of his shirt and then exited through the left front of his jacket.  [*Id.* at ¶34].  Several rounds of ammunition were found in Greenwald's jacket pockets.  [*Id.* at ¶31].

Greenwald disputes Defendants' account and denies that he held his rifle straight out in front of him or that the Officers ordered him to drop his weapon.

Greenwald states in an affidavit filed in support of his opposition to Defendants'
motion for summary judgment that "I did not raise the weapon I was carrying
toward any officer or any other person, and I had no intention to fire my weapon
at anyone."  [Dkt. #55, Pl. Ex. B, Greenwald Affidavit at ¶15].  Greenwald also
testified in deposition that he did not point the gun he was holding at any police
officer.  [Dkt. #55, Pl. Ex. A, Greenwald Dep. at 133].  Lastly, Greenwald testified
that that he heard a lot of yelling but was unable to tell "any of those words that
were being yelled."  [*Id.* at 121].

Greenwald also alleges that Defendants' accounts regarding the shooting
are inconsistent.  Officer Kulas testified in his deposition that "[Greenwald is]
coming up the hill.  The gun is, like, partially angled down.  And as he is coming
up the hill, he starts turning the gun towards us.  And Detective O'Brien yelled to
put down the gun…he was wielding around towards us with the gun."  [Dkt. #55,
Pl. Ex. F, Kulas Dep. at 51-52].  Kulas further testified that Greenwald did not have
the gun pointed with the stock at his shoulder aiming down the barrel at someone
but "saw the gun sort of moving in [their] direction."  [*Id.* at 52].  Kulas also
testified that "we both had our guns on him.  I was about to fire but [O'Brien] fired
first."  [*Id.*].  Officer O'Brien testified that Greenwald was "running in my
direction, he takes a belated stance … he stands sideways, as any marksman
would do, and he raises his gun at me… I informed him to drop the weapon.  He
doesn't, and he continues on in our direction with the gun pointed directly at me
and Sergeant Kulas … I fired two shots to him and he fell to the ground."  [Dkt.
#55, Pl. Ex. D, O'Brien Dep. at 37-38].

6

Defendants allege that Greenwald admitted that when he was carrying his gun that it looked like he was aiming it at the officers.  In support of this allegation, Defendants point to a sworn statement Greenwald made shortly after his arrest in which he stated "I ran back towards the top of the street not even realizing that I was carrying the gun which looked to the officer's like I was aiming at them.  I had no intention to hurt anyone but myself."  [Dkt. #49, Defs. Ex. G, Greenwald Statement].  In addition, Greenwald in his deposition was asked "if someone was ahead of you, it would look to them like you were coming at them with a gun aimed at them; am I correct?" to which Greenwald replied "I don't know if I would say it was aimed at them, but the barrel of the gun would be in their general direction."  [Dkt. #49, Def. Ex. L, Greenwald Dep. at 78].

Greenwald was charged with four counts of Criminal attempt – murder, in violation of Conn. Gen. Stat. §53a-49 (§53a-54a); four counts of Criminal attempt – assault of public safety personnel, in violation of Conn. Gen. Stat. §53a-49 (§53a-167c); four counts of reckless endangerment in the first degree, in violation of Conn. Gen. Stat. §53a-63; interfering with an officer in violation of Conn. Gen. Stat. §53a-167a; breach of peace in the second degree, in violation of Conn. Gen. Stat. §53a-181 and he was held on a one million dollar bond. [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶33].  Greenwald pled guilty under an Alford plea to the charge of attempted assault of police officers in the first degree in violation of Conn. Gen. Stat. §53a-167c, three years probation and six months electronic monitoring. [*Id.* at ¶52].

The Town of Rocky Hill requires all officers to adhere to the training protocol established by state standards and all of the Defendant Officers had successfully completed the municipal police officer training academy program or a state-accepted equivalent. [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶53-56.  All of the Defendant Officers were required to complete state-mandated re-certification training every three years to continue as a municipal police officer, which covers all aspects of law enforcement, including, but not limited to training in use of force, weapons training, rape crisis, individuals in crisis, domestic violence, bias, gang violence, laws of arrest and search and seizure, patrol procedures, making arrests, scene investigation, and firearms training.  [*Id.*].  At time of the incidents alleged in the complaint, the named Defendants had attended supplemental training courses as part of their re-certification requirements and were in full compliance with the re-certification requirements in place at that time. [*Id.*].

Defendants allege that as of November 9, 2007, Chief Custer was not aware of the existence of any prior complaints, reports or observations, whether internal or external, that called into question or challenged the conduct of the Defendant officers with respect to their detaining emotionally and/or mentally disturbed individuals or with respect to their prior knowledge of proper police procedures. [*Id.* at ¶58].  Chief Custer does not directly supervise the Defendant Officers in the performance of their regular and usual police duties.  [*Id.* at ¶63].

The Rocky Hill Police Department received approximately 50 suicide intervention calls each year.  [Dkt. #55, Pl. Ex. C, Custer Dep. at 47-48].   Custer

testified that in his tenure as chief none of the prior suicide intervention calls involved the use of deadly force.  [*Id.* at 49].

Greenwald points out that Conn. Gen. Stat. §7-294g(b) provides that "[e]ach police basic training program conducted or administered by the Division of State Police within the Department of Public Safety, by the Police Officer Standards and Training Council established under section 7-294b or by a municipal police department in the state shall include a course on the recognition and management of child abuse and suicide intervention procedures."  Greenwald also relies on the testimony of his expert Geoffrey Alpert, PhD in which Alpert concluded that based on the "conduct of the Defendants and the training provided deviated materially from the standards as described above in every material aspect of their encounter with the Plaintiff."  [Dkt. #55, Pl. Ex. H, Alpert Letter].

### Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita*

*Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

<u>Analysis of Evidentiary Objections</u>

In his Local Rule 56(a)2 statement, Greenwald makes a blanket objection to Defendants' reliance on several police incident reports as containing inadmissible hearsay.  *See* [Dkt. #55, Pl. Local Rule 56(a)2 Statement].  However, the police incident reports to which Greenwald objects contain the sworn statements of the individual officers recounting their personal acts and observations.  *See* [Dkt. #49, Defs. Exs. A-F].  Therefore these statements consist of facts within the Officer's personal knowledge, are in essence affidavits, and are therefore appropriate to support a motion for summary judgment under Fed. R. Civ. P. 56(c)(4).  The police incidents reports themselves would be admissible as a business record under Fed. R. Evid. 803(6) or a public record under Fed. R. Evid. 803(8*).  Tokio Marine Management, Inc., v. M/V Zim Tokyo*, Nos.91CIV.0063, 1993 WL 322869, at *9 (S.D.N.Y. Aug. 17 1993) (citing *Parsons v. Honeywell, Inc*., 929 F.2d 901, 907 (2d Cir. 1991)).   The entries in the police reports "which result from the officer's own observations and knowledge may be admitted but [] statements made by third persons under no business duty to report may not."  *Id*. (internal quotation marks and citation omitted).  Statements by third persons recorded within the police incident reports should be considered hearsay within

hearsay and therefore must also be subject to an independent hearsay exception to be admissible under Fed. R. Evid. 805.   Therefore the officer to officer statements included in the incident reports would have to be subject to a hearsay exception to be admissible.   Here, the officer to officer statements recorded in the individual incident reports reflect the declarant Officer's impressions and statements made during the encounter with Greenwald and would be admissible under the hearsay exceptions of present sense impression, excited utterance, or then existing mental, emotional or physical condition under Fed. R. Evid. 803(1)-(3).   For example, in one police report, Officer Kulas states that Officer Phelps told him that he believed that Greenwald was trying to backtrack and come up from behind them.  Officer Phelps's statement to Kulas would qualify as a present sense impression as it is a statement describing or explaining an event made immediately after the declarant perceived the event. See [Dkt. #49, Ex. A]. Accordingly, the Court denies Plaintiff's blanket objection to Defendants' reliance on the individual incident reports.

<u>Analysis of Warrantless Entry Claim</u>

While Greenwald does not outright allege in his complaint that the Defendant Officers made a warrantless entry onto his property in violation of the Fourth Amendment, Greenwald does allege in count one that the "Defendant Police Officers did not have a warrant for Plaintiff's arrest" and that the Defendant Police Officers "did not have third party information that Plaintiff had committed, or was in the process of committing, a crime."   [Dkt. #1, Complaint at ¶¶43-53]. Defendants in their motion for summary judgment argue that the Defendants had

a reasonable belief that an emergency existed which justified their entry onto Greenwald's property.  The Court therefore construes Plaintiff's allegations to include a claim that Defendants' conduct was a warrantless illegal entry into a private dwelling.  "The Fourth Amendment's warrant requirement protects one's privacy interest in home or property.  Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *U.S. v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000) (*citing Maryland v. Dyson*, 527 U.S. 465, 544 (1999)).   Defendants argue that their entry into Greenwald's backyard was lawful as it fell within the emergency exception to the warrant requirement.   "Police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance."  *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (internal quotation marks and citation omitted).  "Courts must apply an objective standard to determine the reasonableness of the officer's belief … However, this probable cause requirement must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 196-197 (internal quotation marks and citation omitted); *see also United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) ("The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action.").

Moreover, Defendants are entitled to "qualified immunity as a matter of law with respect to a situation where exigent circumstances, probable cause or reasonable suspicion were needed if the undisputed facts and all permissible inferences favorable to the plaintiff show that (a) it was objectively reasonable for the officer to believe that exigent circumstances, probable cause or reasonable suspicion existed, respectively or (b) officers of reasonable competence could disagree on whether exigent circumstances, probable cause or reasonable suspicion, respectively, were present."  *Signorile By and Through Signorile v. City of New York*, 887 F. Supp. 403, 413 (E.D.N.Y. 1995).

Here, a reasonable officer could conclude that it was objectively reasonable for Defendants to believe that Greenwald was in distress and in need of their assistance and therefore there were exigent circumstances that justified the warrantless entry.  *See Bringham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (finding that police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury).  The Defendant Officers were responding to a report by Greenwald's girlfriend that he had earlier informed her that he intended to commit suicide with a gun.  Moreover, when the Defendant Officers arrived at Greenwald's residence, they observed Greenwald in his backyard by a firepit holding a shotgun.  It was therefore objectively reasonable for the Defendant Officers to believe that exigent circumstances were present based on these observations coupled with the report by Greenwald's girlfriend that he had threatened to commit suicide with a gun.  *See Russo v. City of*

*Cincinnati*, 953 F.2d 1036, 1043-44 (6th Cir. 1992) (warrantless entry was justified by officer's reasonable belief that resident was in danger of committing suicide and noting the court's inability to find "a single case indicating that an officer's attempt to rescue what that officer believes to be a suicidal person does not constitute exigent circumstances").  Accordingly, the Court finds there was no Fourth Amendment violation when the Defendant Officers entered Greenwald's property without a warrant.

**Analysis of Fourth Amendment Excessive Force Claim and Qualified Immunity**

Greenwald alleges that the Defendants' conduct in arresting him and in particular Defendant O'Brien's conduct in firing two shots at him violated the Fourth Amendment's mandate against unreasonable searches and seizures. Claims that a law enforcement official used excessive force during a seizure are analyzed under the Fourth Amendment's "objective reasonableness" standard. Accordingly, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted).  A court must examine: "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).  Further, reasonableness must be judged objectively under the circumstances, "from the perspective of a reasonable officer on the scene," and allow for the fact "that police officers are often forced

14

to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (*citing Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

In addition, Defendants are entitled to qualified immunity with respect to Plaintiff's excessive force claim unless "the official violated clearly established rights of which an objectively reasonable official would have known." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 358 (2d Cir. 2004); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated that first, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right, and then second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. Subsequently, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court ruled that courts are permitted to exercise their discretion in determining which of the two prongs should be addressed first.

Here, the right to be free from the use of excessive force under the Fourth Amendment has long been clearly established. *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000); *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007).

However, "the objective reasonableness [*Graham*] test is met-and the defendant is entitled to immunity-if officers of reasonable competence could disagree on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). "[T]he question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Id.* at 425. In addition where deadly force has been used, "deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer and others. The threat must be immediate." *Woodward v. Town of Brattleboro*, 148 Fed. Appx. 13, 14 (2d Cir. 2005) (citation omitted).

Greenwald argues that there is a genuine dispute as to the material fact regarding whether he aimed his rifle at the Defendant Officers which precludes summary judgment. Greenwald reasons that since he was not aiming his rifle at the Defendant Officers then the Officers could not have a reasonable belief that he was posing a significant threat of death or serious injury. However, even if Defendants applied more force than was actually required by the situation, a government official is protected from liability as "the protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 55 U.S. at 231 (citation omitted). Even when viewing the facts in the light most favorable to the non-moving party, a reasonable officer could conclude that Greenwald posed a significant and immediate threat of death

16

or serious injury under the circumstances presented at the time.  After crediting Greenwald's version of the facts which assumes that Greenwald was not actively aiming his rifle at the Officers, the Court finds that Defendant O'Brien made a reasonable mistake of fact when he concluded that Greenwald was aiming his shotgun at him and Kulas which justified his decision to use deadly force.

Greenwald also argues that O'Brien and Kulas's accounts of the minutes leading up to the shooting differ and therefore cannot be true.  O'Brien testified that Greenwald took a belated stance while Kulas testified that Greenwald was wielding the gun towards them.  *See* [Dkt. #55, Pl. Ex. F, Kulas Dep. at 51-52 and Dkt. #55, Pl. Ex. D, O'Brien Dep. at 37-38].  While the Court agrees that the accounts differ, the Court does not find this to be fatal to a conclusion that the Defendants made a reasonable mistake of fact.  If the Court credits Defendant Kulas's account, a reasonable officer would still conclude that at the time Greenwald was posing a significant and immediate threat of death or serious injury.  Moreover, Kulas's account is consistent with Greenwald's own testimony regarding the minutes leading up to the shooting.  Greenwald testified that while he would not say that he was aiming his rifle at O'Brien and Kulas "the barrel of the gun would be in their general direction."  [Dkt. #49, Def. Ex. L, Greenwald Dep. at 78].  Therefore crediting Plaintiff's own account, it is undisputed that Greenwald was proceeding uphill directly towards O'Brien and Kulas while holding his shotgun with the barrel "in their general direction."  [*Id.*].

In addition, "[w]here officers attempting to make an arrest used deadly force, the objective reasonableness inquiry, for purposes of either Fourth

Amendment liability or qualified immunity, depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36-37 (2d Cir. 2003). Further, the Court "must be cognizant of the fact that the officers are often making split-second judgments in tense, uncertain, and rapidly evolving circumstances." *Graham*, 490 U.S. at 396-97. Here, it is undisputed that when O'Brien and Kulas encountered Greenwald at the cul de sac on Farmstead Road they had been informed that a code 10-0, which is the code for officer in trouble, had been called by Officer Phelps. [Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶¶8-14]. They had also been informed that their fellow Officers had encountered an individual who had been reported as suicidal, was carrying a large shotgun, had fled into the woods north of Farmstead Road and that their fellow officers feared that this individual was backtracking and trying to come up behind them. *See* [Dkt. #49, Defs. Ex. A, Kulas Statement and Dkt. # 49, Defs. Ex. D, Phelps Statement].

Moreover, it is undisputed that Greenwald heard the Defendant Officers shouting at him and did not respond to their shouts. Greenwald admits that he was unable to tell "any of those words that were being yelled." [Dkt. #55, Pl. Ex. A Greenwald Dep. at 121]. In addition, Greenwald admits that he is not positive that the Officers did not instruct him to drop his weapon. In his affidavit submitted in support of his opposition to Defendants' motion for summary judgment Greenwald states "I could not see the defendant officer's uniforms and could not hear any words of identification or instructions to drop my weapon

(even if there were such words)." [Dkt. #55, Pl. Ex. B, Greenwald Affidavit at ¶13]. Therefore, Greenwald admits that he was not responding to the shouts and instructions of the Officers, which may or may not have included an instruction to drop his weapon.  In addition, O'Brien and Kulas could not have known that Greenwald did not realize or recognize that he was being pursued by uniformed police officers nor could they have known that Greenwald did not intend to aim his rifle at them or hurt anyone.  It was therefore objectively reasonable for O'Brien and Kulas to conclude that Greenwald was aware that he was being pursued by uniformed police officers.

Here, when viewing the sum total of the "officer's knowledge of the circumstances immediately prior to and at the moment he made the split-second decision to employ deadly force," a reasonable officer could conclude that it was objectively reasonable for O'Brien to determine there was probable cause to believe that Greenwald posed a significant and immediate threat of death or serious injury to the officer and others.  *Vargo*, 331 F.3d at 36-37.  When O'Brien made the split-second decision to fire two shots at Greenwald, he was confronted with an individual who he reasonably believed was emotionally distressed, had intentionally fled from his fellow police officers who felt they were endangered by his actions, was not responding to his or the other Officer's instructions, and was proceeding uphill directly towards him, holding a shotgun with its barrel in his direction.  A reasonable officer upon confronting the same circumstances would objectively conclude there was probable cause to believe that Greenwald posed a significant and immediate threat of death or serious injury.   While Greenwald

himself may have been in a panic and was frightened, did not realize that he was being pursued by police, did not intend to harm anyone, and was not intentionally aiming his rifle at O'Brien and Kulas that was not readily apparent or knowable to O'Brien during the moment he made the split-second decision to employ deadly force.   Accordingly, it was a reasonable mistake of fact for O'Brien to conclude that Greenwald posed a significant and immediate threat of death or serious injury.

Further, the Court finds the Tenth Circuit's reasoning in *Wilson v. Meeks* to be persuasive and instructive.  *Wilson v. Meeks*, 52 F.3d 1547, 1549-54 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001).   In *Meeks*, the defendant officer, Meeks, suspected that the deceased, Wilson, was holding a weapon but could not see what was hidden behind Wilson's leg. Officer Meeks instructed Wilson that he wanted to see his hand to which Wilson responded no.  It was undisputed that when Wilson brought his hand forward holding a gun that Meeks shot and killed Wilson.  Plaintiffs argued that Wilson was holding the gun in a "surrender position," and since he was not aiming the gun at Meeks, Wilson was subjected to excessive force when he was shot. However, the Tenth Circuit concluded that "any police officer in Officer Meek's position would reasonably assume his life to be in danger when confronted with a man whose finger was on the trigger of a .357 magnum revolver pointed in his general direction.  The exact manner in which Mr. Wilson held out the gun is not dispositive."  *Id.* at 1554.  The Tenth Circuit further explained that the "inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an

objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life.  Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant.  It requires that he react reasonably to a threat.  Officer Meeks did so." *Id.* at 1553-54.

The Tenth Circuit's reasoning in *Meeks* is entirely consistent with the Second Circuit's formulation of the objective reasonableness inquiry which "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Vargo*, 331 F.3d at 36-37.  In the present case, Defendant O'Brien could not have known what was in the heart and mind of Greenwald and likewise encountered a situation in which he reasonably assumed his life to be in danger when confronted with a man holding a shotgun in his general direction. *See also Woodward v. Town of Battleboro*, No.CIV.1:02CV35, 2006 WL 36906, at *8 (D.Vt. Jan. 5, 2006) (Plaintiff "may have, in fact, not intended harm to anyone in the room. Nevertheless, the onus is not on the police to discern that intent.  They must deal with the objective facts before them.  Prior to the shooting, Mr. Woodward had been incoherent and anxious, uncooperative and armed, and within a zone where he could inflict damage on someone ... Under these circumstances, the defendants are entitled to qualified immunity."); *Estate of Chipwata v. Rovinetti*, No.302CV858, 2004 WL 722166, at *6 (D. Conn. March 31, 2004) (finding that officer had reasonable belief that he faced a significant threat of death or bodily harm when the deceased was "known to officer as the suspect in an alleged violent assault, was advancing on the officer, knife in hand, ignoring

instruction to drop the weapon," while shouting "take the knife" even though Plaintiff argued that the deceased was only attempting to surrender the knife). Accordingly, reasonable officers would agree that Defendant O'Brien had an objectively reasonable belief that Greenwald was an immediate threat to his own life and the lives of others and that he reacted reasonably to that threat. Accordingly, Defendants' motion for summary judgment as to Greenwald's excessive force claim is granted.

Defendants argue that Greenwald's excessive force claim should also be barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). In particular, Defendants argue that by pleading guilty to assault, Greenwald has implicitly acknowledged that the officers did not use excessive force. However, the Second Circuit has held that "*Heck* acts only to bar § 1983 suits when the plaintiff has a habeas corpus remedy available to him (i.e., when he is in a state of custody)." *Green v. Montgomery*, 219 F.3d 52, 60 n.3 (2d Cir. 2000). Because Greenwald is not presently in state custody, his § 1983 remedy is not barred by *Heck*.

### Analysis of False Arrest Claim

Defendant moves for summary judgment as to Greenwald's false arrest claim arguing that the Defendant Officers had probable cause to arrest Greenwald and that Greenwald pled guilty under the Alford doctrine to attempted assault of police officers under Conn. Gen. Stat. §53a-49 and §53a-167c. In analyzing a Section 1983 claim of false arrest or imprisonment, federal courts generally look

22

to the law of the state where the arrest occurred.  *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004).

Under Connecticut law, "'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another,'" *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (quoting *Outlaw v. City of Meriden,* 43 Conn. App. 387, 392 (1996)).  In order to succeed on a false arrest claim, a plaintiff must establish that "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Walczyk v. Rio*, 496 F.3d 139, 152 n.14 (2d Cir. 2007) (internal quotation marks and citation omitted).

Probable cause to arrest exists where an Officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).  Moreover, "a claim for false arrest turns only on whether probable case existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  "Probable cause is to be

assessed on an objective basis." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted).  "Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer."  *Weinstock v. Wilk*, 296 F. Supp.2d 241, 256 (D. Conn. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 2003)).

"With respect to qualified immunity, the Supreme Court has recently reminded us that 'the appropriate question is the objective inquiry of whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer [ ] possessed.'"  *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Wilson v. Layne*, 526 U.S. 603 (1999)). "Lawful arrest, i.e., arrest pursuant to probable cause, requires the arresting officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* (internal quotation marks and citation omitted). "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.*  "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)

(internal quotation marks and citation omitted).  Arguable probable cause exists then "'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted).

"Although the tests for probable cause and arguable probable cause are thus not congruent, the concept of probable cause is the same in both inquiries. Probable cause existed if *at the moment the arrest was made* ... the facts and circumstances *within the [officers'] knowledge* and of which they *had reasonably trustworthy information* were sufficient to warrant a prudent man in believing' that [the suspect] had violated the law, and an officer sued under the Fourth Amendment for false arrest is entitled to immunity if a reasonable officer could have believed *that probable cause existed.*"  *Zellner*, 494 at 370 (internal quotation marks and citations omitted) (emphasis in the original).  "Accordingly, like the probable cause analysis, the analysis of a qualified immunity defense to claims that official actions were taken without probable cause entails an inquiry into the facts known to the officer at the time of the arrest a court must evaluate the objective reasonableness of the [Officer's] conduct in light of ... the information the ... officers possessed." Id. (internal quotation marks and citations omitted).

As discussed above, there is no dispute with regard to the Defendant Officers' knowledge nor is there a genuine issue of material fact in dispute as to the pertinent events that transpired.  Here when viewing the facts in the light

most favorable to Greenwald, there was probable cause for Greenwald's arrest for attempted assault of a police officer.  It is undisputed that Greenwald's girlfriend reported to the police that Greenwald was suicidal and in possession of a firearm.  As discussed above, it is also undisputed that the Defendant Officers observed Greenwald with his firearm in his backyard.   When the Officers approached him Greenwald behaved in what the Officers reasonably believed was an evasive and aggressive manner.  Greenwald admittedly did not respond to the Officers' shouts and instructions and had fled from the police into the woods while carrying his firearm in a manner that reasonably appeared to the Officers as if he was aiming his shotgun at them.  It is undisputed that the Officers called a code 10-0 for officer in trouble indicating their belief that Greenwald was posing a threat to the Officers' safety.   As discussed above, it was objectively reasonable for the Officers to assume that Greenwald was aware that he was being pursued by police officers when he fled.   Moreover, the Defendant Officers can be said to have reasonably trustworthy information as the basis for their conclusion that Greenwald had violated the law was their own interactions and personal observations of Greenwald's behavior.  *See Johnson v. Police Officer #17969*, No.99CIV3964, 2000 WL 1877090, at *3 (S.D.N.Y. Dec. 27, 2000) ("Based on the direct observations of Officer Fernandez, it is apparent that probable cause supported plaintiff's arrest.").  Therefore the facts and circumstances within the Defendant Officers' knowledge and of which they undoubtedly had reasonably trustworthy information were sufficient to warrant a prudent man in believing that Greenwald had violated the law.

Even assuming arguendo that Greenwald's arrest was not supported by probable cause, the Defendant Officers would be entitled to qualified immunity as it was objectively reasonable for the Officers to believe probable cause existed. As discussed above, it was not readily apparent or knowable to the Officers that Greenwald was in a panic, did not realize he was being chased by police, was not intentionally aiming his firearm at the Officers, and did not intend to harm anyone.  It was therefore objectively reasonable for the Officers to conclude that probable cause for arrest existed when confronted with an individual who they reasonably believed was fleeing from the police, taking aim with his firearm at the officers while being non-responsive to the officers' instructions.  Accordingly, it was objectively reasonable for the Officers to conclude that Greenwald was behaving in an aggressive and evasive manner such that he was attempting to assault a police officer in violation of the law.

Since the Court has concluded that probable cause supported Greenwald's arrest and probable cause is a complete defense to a false arrest claim, the Court need not address whether Greenwald's Alford plea precludes his false arrest claim.

### Analysis of Supervisory Liability of Defendant Chief Custer

Defendants also argue that Plaintiffs have failed to allege the personal involvement of Defendant Chief Custer in the alleged fourth amendment violations.  "An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority," but can be held liable if he was

personally involved in the alleged deprivation" *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks and citations omitted).  In the Second Circuit, personal involvement has traditionally been shown by the following factors articulated in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995):

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.*

The Court notes that the recent Supreme Court decision in *Ashcroft v. Iqbal* 129 S. Ct. 1937 (2009) has recently called into question whether all of the *Colon* factors remain a basis for establishing supervisory liability and "no clear consensus has emerged among the district courts within this circuit."  *Aguilar v. Immigration and Customs Enforcement Div. of the United States*, No.07CIV8224, 2011 WL 3273160, at *10 (S.D.N.Y. August 1, 2011) (collecting cases).  However, for purposes of deciding the present motion, it is not necessary for the Court to determine the standard for supervisory liability in connection with Fourth Amendment violations as Plaintiffs have failed to establish facts that would satisfy any of the *Colon* factors.

It is undisputed that Custer did not directly supervise the Defendant Officers in the performance of their regular and usual police duties and therefore Custer could have not directly participated in the alleged constitutional violation.

[Dkt. #49, Defs. Local Rule 56(a)1 Statement of Material Facts at ¶63].  Moreover, Greenwald has failed to present any facts indicating that Custer was aware that his subordinate officers had previously engaged in the unlawful application of excessive force in responding to calls regarding suicidal individuals.  In addition, Greenwald has presented no facts indicating how Custer was grossly negligent in supervising the Defendant Officers or that Custer created a policy or custom under which unconstitutional practices occurred.

Deliberate indifference "requires a showing that the official [knew] of and disregard[ed] an excessive risk to inmate safety; the official must both [have been] aware of facts from which the inference could be drawn and that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Coronado v. Goord*, No.99CIV.1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (internal quotation marks and citation omitted).  Here, Greenwald has also failed to present any evidence that Custer had notice that the Defendant Officers would likely respond to a suicide intervention call with unlawful excessive force.  In fact, Custer testified that the Rocky Hill Police Department received approximately 50 suicide intervention calls each year and that during his tenure as chief none of the prior suicide intervention calls involved the use of deadly force.  [Dkt. #55, Pl. Ex. C, Custer Dep. at 47-49].   Accordingly, Defendants have failed to raise any genuine issue of material fact regarding Custer's personal involvement in the alleged constitutional violations and accordingly a reasonable jury could not conclude that Custer was personally involved in the alleged

29

unconstitutional conduct.   Moreover, Defendant Custer would also be protected from suit by qualified immunity as discussed above.

### Analysis of Municipal Liability

Greenwald argues that Rocky Hill failed to provide the Defendant Officers with training in suicide intervention procedures.   Plaintiffs can only sue a municipality under 42 U.S.C. § 1983 for constitutional violations of its employees occurring pursuant to an official policy or custom.   *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).   "Specifically, *Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions ... Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*."   *Reynolds v. Guiliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citations omitted).   In addition, "[i]n limited circumstances, a [municipal entity's] decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983.   A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."   *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).   In addition, a "failure to train will trigger municipal liability only where the failure to train amounts to deliberate indifference to the rights of members of the public with whom the employees will interact."   *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (internal quotation marks and citation omitted).

The Second Circuit has established three requirements for showing that a lack of training results in deliberate indifference. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).   Plaintiffs must submit evidence demonstrating "that a policy-maker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* at 297.  Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.*  "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298.  At the summary judgment stage, an additional requirement exists: a plaintiff must "identify a specific deficiency in the city's training program and establish that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am. v. Town of Hartford*, 361 F.3d 113, 129 (2d Cir. 2004).  The first and second requirements may be established through "proof of repeated complaints of civil rights violations ... followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). The causation requirement may be satisfied by proof that the municipality's inaction "actually caused or was the moving force behind the alleged violations." *Reynolds*, 506 F.3d at 193.

First, Greenwald has failed to present any facts demonstrating a widespread pattern of misconduct to demonstrate a policy or custom within the meaning of *Monell*.  Greenwald has failed to present any facts indicating that

Rocky Hill had notice that its course of training regarding individuals in crisis was deficient.  Further, Greenwald has also failed to present evidence that the Rocky Hill Police Department mishandled similar situations in which officers responded to suicide intervention calls with excessive force.  As discussed above, the Rocky Hill Police Department responded to approximately 50 suicide intervention calls a year and that during Custer's tenure as chief none of the prior suicide intervention calls involved the use of deadly force.  [Dkt. #55, Pl. Ex. C, Custer Dep. at 47-49].  *See Tyrrell v. Seaford Union Free School Dist.*, No.CV-08-4811, 2011 WL 2410722, at *25 (E.D.N.Y. June 1, 2011) ("plaintiff has not established that the Seaford UFSD had notice that its training of its employees with respect to their general supervision of students was deficient in any way, or that there had been a pattern of similar constitutional violations by Seaford UFSD employees. 'Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.'") (quoting *Connick*, 131 S. Ct. at 1360); *Scruggs v. Meriden Bd. of Educ.*, No.3:03-cv-2224, 2007 WL 2318851, at *15 (D. Conn. Aug. 10, 2007) ("Although there is evidence of Defendants' mishandling Daniel's case, there is no evidence that the Board should have been on notice that training and supervision of its employees should be better implemented. Plaintiff has presented no evidence regarding school administrators' mishandling similar situations in which students with special education needs were bullied or harassed by their classmates … Plaintiff has failed to raise any genuine issue of material fact as to the Defendant Board's

failure to train or supervise its employees"). Accordingly, the town of Rocky Hill could not have been deliberately indifferent if it was not aware that its training program was deficient and the cause of unconstitutional conduct.

The Court notes that a plaintiff may successfully allege a failure-to-train claim without showing a pattern of constitutional violations "in a narrow range of circumstances." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997). Under such circumstances, "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. Where there is no evidence of other similar occurrences, a plaintiff must show that the alleged constitutional violation was so highly predictable that it reflected a conscious disregard of the municipality to this deprivation. *Sayers v. City of New York*, No.CV-04-3907, 2007 WL 914581, at *6 (E.D.N.Y. March 23, 2007) (internal quotation marks and citations omitted). Here, Greenwald has failed to demonstrate that the application of excessive force when responding to suicide intervention calls was a highly predictable consequence of failure to train suicide intervention procedures. Moreover, the fact that the Police Department had for years responded to numerous suicide intervention calls without a single incident of excessive force further undermines a conclusion that excessive force is the highly predictable consequence of such a failure to train.

Second, while Greenwald argues in his opposition to the motion for summary judgment that he intends to call an expert, Geoffrey P. Alpert, Ph.D. to testify that the Defendant Officers actions deviated materially from national

standards in suicide intervention procedures, Greenwald has failed to present any evidence demonstrating that the failure to train suicide intervention procedures caused the Defendant Officers to apply excessive force against him. [Dkt. #55, Pl. Mem. in opposition to Summary Judgment at 31]. Greenwald has therefore failed to demonstrate a direct causal link between the municipal action and the alleged deprivation of his federal rights. The goal of a suicide intervention course would presumably be to teach officers techniques that would help the officers prevent suicides from occurring. It is unclear to the Court how such techniques would have prevented the officers from applying excessive force when faced with the situation where an individual is advancing while holding a loaded gun in the direction of the officer. In fact, as Defendants argue Greenwald's expert "admitted that the defendant officers' conduct was in compliance with the standards expected of reasonable police officers that are faced with an individual pointing a loaded shot gun at them." [Dkt. #56, Defs. Reply Mem. in support of Summary Judgment at 6]. There is simply no evidence in the record demonstrating that the failure to train was the cause of the alleged constitutional violation or that the Rocky Hill was aware that such a failure to train would result in such unconstitutional conduct. *See Carr v, Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003) ("the fact that someone with the opportunity to prepare an expert report at leisure opines that well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City, for Carr fails to point to any evidence placing the City on actual or constructive notice that the asserted failures to train were

substantially certain to result in a constitutional violation.").   Accordingly, Defendant Town of Rocky Hill is entitled to summary judgment.

### Remaining State Law Claims

Having granted summary judgment as to the federal law claims against Defendants, the Court declines to exercise its supplemental jurisdiction over Greenwald's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.   Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F.Supp.2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Here, while this case is several years old and nearly ready for trial, the Court has not ruled on any prior substantive motions and therefore has not developed familiarity with any of the state law issues in this case.  Moreover, several of the remaining claims involve state constitutional law questions which are best resolved by state courts.  *See Horton v. Town of Brookfield*, No.CIV.A.3:98CV01834, 2001 WL 263299, *9 (D. Conn. March 15, 2001) ("In balancing the factors in this case, the court declines to exercise supplemental jurisdiction over the remaining claims.  The case is two years old and nearly ready for trial.  In addition, the court has ruled on various dispositive motions and developed familiarity with the issues in the case.  However, none of the court's rulings have specifically addressed the remaining state law claims, and the court is not familiar with those claims … The claims are purely state law claims and, particularly since some of them involve issues of state constitutional law, are better decided by the state courts.").  Since the remaining claims are purely state law claims, the Court declines to exercise jurisdiction over those claims.  Those claims are dismissed without prejudice to refilling in state court.

<u>Conclusion</u>

Based upon the above reasoning, the Defendants' [Dkt. #47] motion for summary judgment is GRANTED.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

**United States District Judge**

**Dated at Hartford, Connecticut: October 17, 2011**